**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DUANE E. HENLINE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **No. 3:20-CV-1944-D-BH** |
| | § | |
| **COMMISSIONER, SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge[1]** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Duane E. Henline (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits (DIB) and for supplemental security income (SSI) under Title II and Title XVI of the Social Security Act. (*See* docs. 1, 18.) Based on the relevant findings, evidence, and and applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

## I.    BACKGROUND

### A.    Procedural History

On December 21, 2017, Plaintiff protectively filed his applications for DIB and SSI, alleging disability beginning on April 30, 2017. (doc. 15-1 at 14, 81, 90.)[2] His claims were initially denied on February 15, 2018, and upon reconsideration on June 25, 2018. (*See id.* at 14, 139-44, 149-52.) On August 23, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*See id.* at 153-54.) He appeared and testified at a hearing on May 23, 2019. (*See id.* at

---

[1] By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

35-80.)  On August 16, 2019, the ALJ issued a decision finding that he was not disabled.  (*See id.* at 11-33.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on October 2, 2019. (*Id.* at 197-99.)  The Appeals Council denied his request for review on May 28, 2020, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 5-9.)  He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**    **Factual History**

**1.**    *Age, Education, and Work Experience*

Plaintiff was born on January 8, 1978, and was 41 years old at the time of the hearing (*See* doc. 15-1 at 35, 81.)  He had a high school education and could communicate in English.  (*Id.* at 43, 228, 230.)  He had past relevant work experience as a cook, a parts salesperson, a fabricator, and an autobody repairer and helper.  (*Id.* at 71.)

**2.**    *Medical Evidence*

In September 2013, Plaintiff presented to triage at Mercy Hospital Springfield (Mercy) in Springfield, MO, for chest, back, and neck pain, and aching.  (*Id.* at 309-27.)  He initially reported the pain as constant and rated it at 10 on a pain assessment scale of 0-10, and he had associated symptoms of nausea, vomiting, dyspnea, and anxiety.  (*Id.* at 313-14, 319.)  No indicator of depression was present.  (*Id.* at 317.)  He was treated for a chronic non-ST elevated myocardial infarction, coronary artery disease, post-status coronary intervention with a drug-eluting left anterior descending artery (LAD) stent, and chronic diabetes mellitus.  (*Id.* at 328, 383.)

On October 8, 2013, he returned to Mercy where he was treated by David S. Cochran, M.D., and received an elective staged percutaneous coronary intervention (PCI).  (*Id.* at 342-43, 345.)  He reported no new cardiac symptoms and had not yet returned to work.  (*Id.* at 342.)  On

October 21, 2013, he presented to the emergency department at Mercy complaining about bleeding gums. (*Id.* at 483-84, 525.) He reported no pain and was discharged the same day. (*Id.* at 490-91, 531-38.) On November 21, 2013, he returned to Mercy and was treated by Dr. Cochran for a chronic left ventricle dysfunction. (*Id.* at 540-45, 563.)

On May 4, 2016, he presented to the emergency department of Mercy for a wound check; he reported having chills, two raised areas on his upper back, and pain at a 10/10. (*Id.* at 581-82, 620, 624.) He also reported having mild chest pain for the past three years, which he described as soreness in nature and which worsened with exertion, but the pain was chronic, unchanged, and not bad enough to take nitroglycerin. (*Id.* at 582, 586-87.) He was diagnosed with cellulitis of the upper back, excluding the scapular region, and a personal history of methicillin-resistant staphylococcus aureus infection. (*Id.* at 574-75, 581, 586-88, 613.) His mood, affect, and behavior were normal, and no depression indicator was present. (*Id.* at 586, 622).

From late 2017 through early 2019, Plaintiff presented to various entities within the JPS Health Network (JPS) in Fort Worth, Texas, for ankle pain, arthritis of the right elbow, bursitis of the right shoulder, chronic low back pain, chronic systolic heart failure, coronary arteriosclerosis in native artery, diabetic polyneuropathy, diabetes mellitus, generalized ischemic myocardial dysfunction, hypercholesterolemia, right knee pain, lateral epicondylitis, diabetic retinopathy, recurrent major depressive episodes-moderate, mixed hyperlipidemia, shoulder pain, and supraspinatus syndrome. (*Id.* at 688-89, 943-45.)

On October 10, 2017, Plaintiff presented to the emergency room of JPS Hospital with chest pain. (*Id.* at 714-15, 830, 838.) He reported sharp and constant chest pain with associated nausea which woke him from sleep that morning, lasted 5-6 hours, and felt like his previous myocardial infarction. (*Id.* at 715, 720, 728, 732, 830.) He also reported intermittent exertional chest pain for

the prior several months that was relieved by rest, fatigue with minimal exertion, and severe lower back pain that he rated as a 10/10. (*Id.* at 720, 724, 838, 846.) He reported chronic low back pain with flares. (*Id.* at 720.) He exhibited a normal mood and affect upon physical examination. (*Id.* at 721-22.) He underwent a left heart catheterization and had two stents placed, and was discharged on October 12, 2017. (*Id.* at 858-59, 874.)

On October 23, 2017, Plaintiff presented at a JPS emergency room for right ankle pain. (*Id.* at 710.) He reported that a truck he was working on fell off the jack, and the truck's rotor landed on his right foot and ankle. (*Id.*) The rotor was on his foot for about three minutes, and he had not been able to bear weight on the foot since then. (*Id.* at 710, 876.) During a musculoskeletal examination, he had a normal range of motion and exhibited edema and tenderness of the right foot. (*Id.* at 712, 878.) X-rays of the right foot and ankle showed no fracture or dislocation. (*Id.* at 712, 750-52, 879.) He was diagnosed with acute right ankle pain, a right ankle sprain, and contusion of the right ankle. (*Id.* at 713-14.)

On October 24, 2017, Plaintiff was admitted to JPS Hospital for chest pain and the placement of two coronary stents. (*Id.* at 708.) He reported his sprained ankle diagnosis from the previous day and complained of having had right elbow and shoulder pain for over one year. (*Id.* at 708, 882.) He felt that his right elbow was deformed. (*Id.*) He also reported chest pain for several days, some chronic back pain for the past week, and not taking his medications for over one year. (*Id.*) A review of his musculoskeletal system was positive for joint stiffness, back pain, and a gait problem, and a physical exam indicated that he had a right ankle brace in place. (*Id.* at 708-09, 883.) He was also assessed with right chronic elbow and shoulder pain. (*Id.* at 709, 884.) An X-ray of his right elbow showed mild degenerative changes of the radioulnar joint and no acute bone abnormalities, fracture, or dislocation. (*Id.* at 745-46.) An X-ray of his right shoulder showed

minimal degenerative changes and no acute bone abnormalities.  (*Id.* at 747-48.)

On November 7, 2017, Plaintiff presented to JPS provider Yuvaraj Darren Kumar, M.D., for a follow-up after having spent several days in the hospital with chest pain.  (*Id.* at 703, 887-88.)  He reported chronic back pain and said he was doing well from a cardiac standpoint following his discharge from the hospital.  (*Id.*)  He expressed frustration about getting rejected for disability benefits and claimed others with less severe conditions were receiving disability benefits.  (*Id.* at 703, 888.)  He stated that he could not do yard work or physical activity for an extended period of time because he would get physically exhausted.  (*Id.*)  Plaintiff also presented for a diabetic follow-up, where he reported to a family nurse practitioner that he had trouble sleeping and focusing, experienced chills, and had ADHD.  (*Id.* at 706, 885-86.)  He presented again for diabetes follow-up visits with JSP providers on November 14 and 30, 2017.  (*Id.* at 694-703.)

On December 4, 2017, he presented to JPS provider Christie Shanafelt, D.O., to establish care.  (*Id.* at 691-92, 904-05.)  He reported intermittent moderate to severe sharp, shooting pain in his right ankle since his ankle injury two months prior.  (*Id.* at 692, 905.)  He stated that the pain worsened with activity and direct pressure and improved with rest and relief of direct pressure.  (*Id.* at 693, 905.)  He also complained about intermittent moderate to severe aching pain in his right shoulder that was accompanied by a decreased range of motion; the pain worsened with activity and improved with rest.  (*Id.*)  He denied any chest pain, shortness of breath, side pain, headache, dizziness or weakness.  (*Id.*)  During a physical exam, his right shoulder showed a decreased range of motion, a positive for supraspinatus impingement, and pain.  (*Id.* at 693, 906.)  He also exhibited tenderness in the medial malleolus of his right ankle.  (*Id.*)  His left shoulder and left ankle were normal; his mood, affect, behavior, judgment, and thought content were also normal.  (*Id.* at 692-93, 906.)

On December 8, 2017, he presented to JPS for a follow-up with a chief complaint of neuropathy pain in his legs and feet, and he reported foot paresthesia, peripheral neuropathy, fluctuating pain in both legs, and symptoms of numbness and tingling that were aggravated by movement. (*Id.* at 690, 908-09.) His neurological system was positive for tingling and numbness, and he exhibited tenderness of his lower legs during a physical exam. (*Id.* at 691, 909.) His mood, affect, behavior, judgment, and thought content were normal. (*Id.*) On January 10, 2018, Dr. Shanafelt diagnosed him with arthritis of his right shoulder and bursitis and inflammation of one of the tendons of his rotator cuff; she referred him for an injection. (*Id.* at 690, 910-11.) An MRI of his right shoulder indicated mild supraspinatus tendinosis without evidence of a rotator cuff tear, bursitis, and osteoarthritis. (*Id.* at 742-43.)

On January 24, 2018, he presented to Josh Sirucek, D.O., at a JPS sports medicine clinic for a consult on his chronic right shoulder pain. (*Id.* at 911, 968-69.) He reported that the shoulder pain had started a year previously after he repeatedly lifted car batteries for work. (*Id.* at 911, 969.) He had pain with all motion, but denied a decreased range of motion, weakness, and changes in sensation in his hands. (*Id.*) Dr. Sirucek's review of Plaintiff's musculoskeletal system was positive for joint pain and myalgias. (*Id.* at 912, 969.) Review of Plaintiff's psychiatric/behavioral system was negative for depression, and his mood, affect and behavior were normal. (*Id.* at 912, 915, 969, 971.) An exam of his right shoulder indicated tenderness in the acromioclavicular joint, a normal range of motion, normal shoulder strength, and normal sensation. (*Id.* at 914, 970.) His left shoulder had a normal range of motion and no tenderness. (*Id.* at 914, 971.) Dr. Sirucek diagnosed him with impingement syndrome of the right shoulder. (*Id.* at 915, 971.)

On February 13, 2018, Plaintiff presented to Dr. Kumar for a follow-up visit following his recent hospitalization. (*Id.* at 965.) He reported that he had chest pain, fatigue, and shortness of

6

breath while performing activities; he had to take breaks when he tried to do yard work; and he could not walk around swap meets with his mother without taking frequent breaks. (*Id.*) He also reported that he could not do his exercise and hobbies, such as biking, because he got fatigued. (*Id.*) The same day, an occupational therapy initial assessment was completed on Plaintiff's right shoulder. (*Id.* at 968.) He reported that he always had pain, and that it worsened with use and improved with rest and bio-freeze; he rated the pain at 5/10 when at rest, and 10/10 with use. (*Id.*) An objective evaluation indicated a bilateral range of motion within functional limits and full bilateral strength. (*Id.*)

On February 12, 2018, Robin Rosenstock, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment for Plaintiff based on the medical evidence. (*Id.* at 85-87.) She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than that shown for lift and carry; frequently climb ramps, stairs ropes, ladders, and scaffolds; and frequently balance, stoop, kneel, crouch, and crawl, with no manipulative, visual, communicative, or environmental limitations. (*Id.* at 85-86.)

On February 21, 2018, Plaintiff presented to JPS hospital for an elective left heart catheterization and recovered without incident. (*Id.* at 960-63.) On March 9, 2018, he presented to Dr. Shanafelt for a follow-up on his chronic conditions. (*Id.* at 957-58.) He complained of worsening numbness, tingling, and burning pain in both hands and feet over the past several months that was not being controlled by his current dosage of prescription medication. (*Id.* at 958.) He also complained of dysphoric mood; he reported spending most days with his friends down the street, but he admitted that some days he did not feel up to it. (*Id.*) His mother noted

that he sometimes did not leave his room for a whole day.  (*Id.*)  Plaintiff denied suicidal or homicidal ideation and wanted to try Cymbalta for his mood.  (*Id.*)  He also complained about intermittent moderate to severe aching lower back pain that worsened with activity and improved with rest, and about episodes of right elbow pain for the prior month.  (*Id.*)  A review of his neurological system was positive for numbness, tingling, and burning of the hands and feet.  (*Id.* at 959.)  His psychological/behavioral system was positive for dysphoric mood, and negative for agitation, behavioral problems, confusion, deceased concentration, hallucinations, self-injury, sleep disturbance, and suicidal ideas.  (*Id.*)  He was assessed with a moderate episode of recurrent major depressive disorder, for which he was prescribed Cymbalta, and with arthritis and lateral epicondylitis of the right elbow.  (*Id.*)

Also on March 9, 2018, Dr. Shanafelt completed a medical release/physician's statement. (*Id.* at 921-22.)  Dr. Shanafelt opined that Plaintiff was unable to work, or participate in activities to prepare for work, at all.  (*Id.* at 921.)  She also opined that he would not be able to participate in activities such as community work in an office with little physical strain or demand.  (*Id.*)  She identified a primary disabling diagnosis of right shoulder supraspinatus impingement, and a secondary diagnosis of diabetic polyneuropathy.  (*Id.* at 922.)

On March 29, 2018, Plaintiff presented to Dr. Sirucek for right elbow pain on referral from Dr. Shanafelt.  (*Id.* at 955-56, 960.)  He reported having pain over his elbow for months that worsened with lifting and extending the wrist; he also reported some pain when turning his wrist. (*Id.* at 956.)  An examination of the right elbow indicated tenderness, a normal range of motion, and full muscle strength.  (*Id.*)  His left elbow was normal.  (*Id.*)  His mood, affect, behavior, judgment, and thought content were normal.  (*Id.* at 957.)  The same day, he presented to Scott T. Stoll, D.O., Ph.D., at Stoll Neurodiagnostics on referral from his counsel.  (*Id.* at 923.)  Dr. Stoll

noted that Plaintiff had a 6-year history of "'pain all over,'" including pain of the neck, back, shoulders, wrists, hands, hips, knees, and ankles, and that he had numbness and painful tingling in his feet and fingertips that was worse at night. (*Id.*) Based on electrodiagnostic testing and physical examinations, Dr. Stoll concluded that Plaintiff had moderate to severe polyneuropathy that was much worse in the legs than the arms, mild to moderate carpal tunnel syndrome, mild to moderate right shoulder bursitis and shoulder impingement syndrome, mild right ankle joint arthrosis, and moderate right elbow tendonitis. (*Id.* at 927-28.) His left shoulder had a full active range of motion. (*Id.* at 923.)

On April 20, 2018, Plaintiff presented to Dr. Shanafelt for moderate to severe aching pain in his right knee. (*Id.* at 952.) He reported that the pain was present for over a year, worsened with ascending and descending stairs and excessive walking, improved with rest, and gave out at times. (*Id.*) He also complained about continued moderate to severe aching and sharp pains in his right shoulder and elbow. (*Id.* at 953.) He reported that his antidepressant medication was effective in helping control his depression and denied suicidal or homicidal ideation. (*Id.*) A review of his musculoskeletal system was positive for joint stiffness of his right knee, shoulder, and elbow, and lower back pain. (*Id.*) A physical examination indicated a decreased range of motion, tenderness, and pain of his right shoulder, and effusion, abnormal mobility, and tenderness of his right knee; his left shoulder and knee were normal. (*Id.* at 953-54.) His mood, affect, behavior, judgment, and thought content were normal. (*Id.* at 954.)

On April 25, 2018, he presented to Douglas Segars, D.O., of MHMR of Tarrant County (MHMR) for a psychiatric evaluation. (*Id.* at 935-40.) His chief complaint was that he had "a real short fuse," and he reported worsening depression, mistrust of people, thoughts of suicide (but denied that he would take his own life), guilty feelings, and poor sleep. (*Id.* at 936.) Plaintiff's

noted diagnoses included major depressive disorder, severe without psychotic features, and a Global Assessment Functioning (GAF)[3] score of 45 at that time. (*Id.* at 935.) Dr. Segars also noted that there was no evidence of a problem with Plaintiff's levels of functioning in family and social roles. (*Id.* at 939.) He prescribed an increased dosage of Cymbalta, an antidepressant and nerve pain medication, and extensive supportive therapy in session. (*Id.* at 940.)

On May 1, 2018, Plaintiff returned to JPS for a follow-up visit to his February 2018 hospitalization. (*Id.* at 947.) He reported having a bit more energy and being in better spirits than in the past, and he stated that his emotional stability was better with Cymbalta. (*Id.*) He also reported that he could not bike for long distances and that he still had difficulty with diabetic neuropathy. (*Id.*)

On June 20, 2018, he presented to Dr. Shanafelt to follow-up on his chronic conditions. (*Id.* at 999.) He continued to report intermittent moderate to severe burning, tingling, and aching of his hands, arms, legs, feet, and right elbow and shoulder that worsened with activity and improved with rest. (*Id.*) He also reported episodes of decreased grip strength in both hands, with the right worse than the left. (*Id.*) He also complained about intermittent moderate to severe lower back pain that worsened with staying in one position too long and improved with frequent position changes, and about episodic depression. (*Id.* at 999-1000.) A review of his systems was positive for shortness of breath on exertion, lower back pain, burning and tingling of hands, arms, right elbow and shoulder, and both feet and legs, grip strength weakness of both hands with the right

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). Notably, "in the updated version of the DSM, the American Psychiatric Association no longer recommends the use of the GAF scale as a diagnostic tool for assessing a patient's functioning due to 'its conceptual lack of clarity. . .and questionable psychometrics in routine practice.'" *Spencer v. Colvin*, No. EP-15-CV-0096-DCG, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) p. 16 (5th ed. 2013)); *see also Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015), *adopted by* 2015 WL 7582339 (N.D. Tex. Nov. 25, 2015).

worse than the left, and dysphoric mood.  (*Id.* at 1000.)

On June 20, 2018, SAMC Dennis Pacl, M.D., completed a physical RFC assessment based on the medical evidence, on reconsideration of Plaintiff's application for benefits.  (*Id.* at 112-14.) He opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry; occasionally climb ramps, stairs, ropes, ladders, and scaffolds; occasionally kneel, crouch, and crawl; and frequently balance and stoop; limited reaching on the right in front, laterally, and overhead, with unlimited handling, fingering, and feeling.  (*Id.* at 113.)

On June 21, 2018, SAMC Ryan Hammond, Psy.D., completed a psychiatric review technique (PRT) assessment and mental RFC assessment based on the medical evidence, on reconsideration of Plaintiff's application for disability benefits.  (*Id.* at 109-10, 114-16, 125-26, 130-32.)  Dr. Hammond opined that Plaintiff had mental impairments resulting in a moderate range of limitations with understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.  (*Id.* at 109, 125.)  Regarding these categories, he opined that Plaintiff was moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (*Id.* at 115-16, 131-32.)  He opined that Plaintiff had no understanding and memory limitations and was "not significantly limited" in his abilities to

carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (*Id.* at 114-116, 130-32.) Dr. Hammond's mental RFC simultaneously indicated that Plaintiff was able to understand, remember, and carry out detailed non-complex instructions, make decisions, maintain attention and concentration, interact with others, and respond to changes. (*Id.* at 116, 132.) Dr. Hammond did not identify or explain any specific capacities or limitations, and he noted that the alleged limitations caused by Plaintiff's symptoms were not fully supported by the record. (*Id.*)

On June 22, 2018, Plaintiff presented to Dr. Segar at MHMR for a medical management follow-up. (*Id.* at 1130.) He reported that his major depressive disorder had gotten better and that his family noticed he was calmer and more able to calm down. (*Id.*) He still had road rage, but it was not a big deal, and although his excessive video gaming contributed to his anger outbursts, it did not bother him anymore. (*Id.*) His association, judgment, and memory were intact; he was oriented to person, place, and time; and his mood was described as euthymic. (*Id.* at 1130-31.) The severity of his mental disorder was identified as mild, and he had a GAF score of 55 at that time. (*Id.*)

On September 14, 2018, Plaintiff returned for a follow-up appointment with Denise Keene, R.N., at MHMR. (*Id.* at 1120, 1124.) He reported moods that were "'going downhill'" over the

preceding months, suicidal ideation but no plan or intent to harm himself, restlessness, increased anxiety, racing thoughts, difficulty concentrating/focusing, avoiding people, and difficulty falling and staying asleep. (*Id.*) Based on a mood disorder questionnaire completed by Plaintiff, a PA reviewed symptoms of manic depressive disorder with him and suggested an increased dosage of Cymbalta and the addition of a prescription for trazadone. (*Id.* at 1120-21, 1124-25.)

On October 9, 2018, Plaintiff returned to Dr. Shanafelt to follow-up on his chronic conditions. (*Id.* at 1003.) He complained of worsening right shoulder pain accompanied by episodic moderate to severe aching pain in the neck. (*Id.* at 1004.) He reported alternating depression and manic symptoms and stated that his mental health had a detrimental effect on his ability to manage his other medical conditions. (*Id.*) He also complained of chronic scabbing, cracking, bleeding, and fibrotic wound edges of an old wound on his back. (*Id.*) A review of systems was positive for right shoulder joint stiffness, lower back and neck pain, chronic scabbing, cracking, bleeding of a fibrotic wound, and behavioral problems. (*Id.*) Upon physical examination of his right shoulder, he exhibited a decreased range of motion due to pain, pain, and normal strength; his left shoulder was normal. (*Id.*)

On October 29, 2018, Plaintiff presented to Jina Cochran, a licensed clinical social worker (LCSW) for JPS, for worsening symptoms of depression due to chronic pain. (*Id.* at 1009.) He reported that he felt that his depression was the result of being in constant pain and neuropathy. (*Id.*) He voiced suicidal ideation but stated that he had no plan to end his own life. (*Id.*) He also reported difficulty sleeping, restless sleep, daytime sleepiness, and not feeling rested upon awakening. (*Id.*)

In November 2018, Plaintiff again saw Dr. Shanafelt for a medical release/physician's statement. (*Id.* at 520-21.) Dr. Shanafelt opined that he was unable to work or participate in

activities because of a permanent disability. (*Id.* at 520.) She identified ischemic cardiomyopathy as a primary disabling diagnosis and chronic bilateral low back pain with sciatica as a secondary disabling diagnosis. (*Id.*)

On November 13, 2018, Plaintiff presented to Patrick Chen, M.D., for evaluation and treatment of skin lesions on his back and scalp. (*Id.* at 1019.) Dr. Chen noted that Plaintiff was negative for behavioral problems and dysphoric mood. (*Id.*)

On November 15, 2018, he presented to Dr. Kumar for a follow-up visit to his recent hospitalization. (*Id.* at 1023.) He reported that he could not exercise due to his back pain, felt very weak and fatigued whenever he engaged in any activity, and was tolerating his depression medication well. (*Id.*) He also presented to MHMR for a follow-up appointment with Nurse Keene. (*Id.* at 1118, 1122.) He reported no change in his mood, continued restlessness, increased anxiety, racing thoughts, difficulty concentrating/focusing, and self-isolation. (*Id.*) He also reported periods of 2-3 days with little sleep and high energy, continued road rage, and socializing online in video games. (*Id.*) He enjoyed walking and had hobbies. (*Id.* at 1119, 1123.) His Cymbalta dosage was increased. (*Id.* at 1118, 1122.)

On January 18, 2019, Plaintiff presented to Dr. Shanafelt to follow-up on his chronic conditions. (*Id.* at 1040.) He complained about worsening depressive symptoms, including increased need for sleep and overeating, and reported that he was told that he was "'manic-depressive' but not bipolar.'" (*Id.*) He continued to complain about intermittent moderate to severe aching pains in his neck and lower back that worsened with activity and improved with rest, accompanied by burning and tingling from his right shoulder to his right hand. (*Id.* at 1041.) He also reported occasional chest pain and shortness of breath when walking ½ to 1 block or climbing one flight of stairs. (*Id.*) He stated that parethesias were controlled with medication except for in

14

his right arm and hand.  (*Id.*)  A review of his systems was positive for appetite change, shortness of breath, chest pain, back and neck pain, burning and tingling of right arm, dysphoric mood, and sleep disturbance.  (*Id.*)

On February 7, 2019, Plaintiff presented to Dr. Segars for depression and hopelessness. (*Id.* at 1113.)  He reported frustration about not working, being sick, and being in pain, and he stated that he would be happy if he were not in pain.  (*Id.*)  His Cymbalta prescription helped with his short temper, and he reported that he preferred staying up at night and sleeping during the day. (*Id.*)  He also reported a loss of interest in video games and socializing, denied a goal or plan for suicide, and declined antidepressant augmenters.  (*Id.*)  An exam of his mental status indicated a linear and goal-directed thought process, normal associations and thought content, passive suicidal thinking, intact judgment, insight, and memory, grossly intact attention, and a depressed and irritable mood with a corresponding affect.  (*Id.* at 1115.)  Dr. Segars' diagnoses of Plaintiff included major depressive disorder, recurrent severe without psychotic features.  (*Id.*)

On May 2, 2019, an upper extremity evaluation for Plaintiff was completed by Brandie Slaughter, OTR, at Fort Worth Physical Therapy Hand Therapy Center.  (*Id.* at 1213-15.)  Plaintiff reported pain and numbness in his hands, and neuropathy from his elbows to hands and lower extremities.  (*Id.* at 1215.)  During the examination, he required multiple rest periods due to pain in his right shoulder when performing reaching tasks.  (*Id.*)  He dropped multiple items with his left hand when performing fine motor tasks, and he placed his elbows on the tabletop to assist him with fine motor coordination tasks.  (*Id.*)  The evaluation's range of motion measurements indicated that Plaintiff's range of motion was below normal in most categories for both shoulders, elbows, and wrists.  (*Id.* at 1210.)  The range of motion in most categories for his right thumb and his left fingers and thumb were also below normal.  (*Id.*)  The evaluation also indicated that his

strength measurements on both arms were below normal, and that Plaintiff self-rated at an extreme impairment of the arm, shoulder, and hand.  (*Id.* at 1215.)

### 3.    *Hearing Testimony*

On May 23, 2019, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id.* at 35-80.)  Plaintiff was represented by an attorney.  (*Id.* at 37.)

### a.    <u>Plaintiff's Testimony</u>

Plaintiff testified that he last worked in 2017 for a lawn service company.  (*Id.* at 39-40.) He hurt his lower back at this job, started having heart trouble, and moved to Texas, where he started seeing JPS providers.  (*See id.* at 40.)  He had a hard time standing for very long and wearing shoes and socks because of neuropathy in his feet.  (*Id.* at 41.)  The pain in his arms, hands, and legs prevented him from doing anything for long periods of time.  (*Id.*)  When his heart rate rose from physical labor, he had chest pains that required him to take a nitroglycerin pill, and he would get light-headed and exhausted for three or four hours afterwards.  (*Id.*)  He could not raise his right arm higher than midway because of his shoulder, and the pain in his hands did not allow him to grip or hold anything for long periods.  (*Id.*)  He went to MHMR for treatment because he was depressed and angry due to being sick all the time.  (*Id.* at 42.)  He took an antidepressant, which helped some, but he was still depressed because he was unable to do anything, work, or be physical the way he was in the past.  (*Id.*)  He felt trapped in his body and was often very depressed.  (*Id.*)

He was in special education classes from the third or fourth grade until he received his high school degree from Trimble Tech High School in Fort Worth, Texas.  (*Id.* at 42-43.)  He was in special education classes because he did not learn how to read until the fourth grade, and because he had dyslexia.  (*Id.* at 43.)  In the twelfth grade, he was in a vocational technical program where he studied autobody repair.  (*Id.* at 43-44.)  After moving from Missouri to Texas, his Texas high

school told him he had too many credits, so he was allowed to get a job and finish high school right away. (*Id.* at 43-44.) Because he was in special education classes, he was not required to take the test necessary to graduate high school. (*Id.* at 43.)

Plaintiff had lived with his mother and her boyfriend since he stopped working. (*Id.* at 44.) He mostly got along with his mother, but sometimes he did not have control over his emotions and would frequently snap at his mother for not respecting his boundaries. (*Id.* at 54.) His mother financially supported him, he received healthcare from JPS and MHMR, and he received food stamps. (*Id.* at 44.) Most days, he woke up, showered, took his medication, checked his blood sugar, and tried to make breakfast. (*Id.*) He made food that he could heat in the oven or microwave. (*Id.*) He did not like standing in front of the stove for too long because his knees and feet would start hurting, and he would get shooting pain through his calf muscles. (*Id.* at 44-45.) He did not take care of his diabetes the way he should because sometimes he was too depressed, or he was overwhelmed and did not remember, or he was not responsible enough to make sure he took his medication as prescribed. (*Id.* at 45.) During the day, he napped because his medication made him very sleepy. (*Id.* at 46.) Between naps, he watched television for between six and eight hours per day. (*Id.*)

Plaintiff helped out with household chores very minimally; he tried to take care of his bedroom and bathroom, and he did not do a lot of sweeping, mopping, vacuuming, or taking out the trash. (*Id.*) He could not take out the trash because it was too much work, and the trash cans were usually too heavy. (*Id.* at 47.) He did one small load of laundry every two days so that he did not have to carry a heavy laundry basket from his bedroom to the laundry room. (*Id.*) If he had to carry anything heavier, he used a cart with wheels on it. (*Id.*) He drove once or twice a week to go to his doctor appointments, the grocery store, and his friend's or brother's house. (*Id.*

at 47-48, 54-55.)  He went to the grocery store every two days, pushed a basket because he needed something to lean on, and went late at night or early in the morning when there were not many people around because he did not like interacting with people.  (*Id.* at 48, 55-56.)  He did not get along with people, and little things set him off, so he tried to avoid people so his anger would not get overheated.  (*Id.* at 48.)  He lost several jobs in the past because he could not get along with others; at most of his cooking jobs, he was fed up with others slacking off and leaving him to carry all the weight and he usually walked off the job after calling the others out because nothing was ever resolved.  (*Id.*)

He had two friends and family members he visited once or twice a week.  (*Id.* at 49, 55.)  They played video games, but Plaintiff could not play them a lot anymore because his hands could not hold the remote for very long, so they mostly watched television and talked about cars.  (*Id.* at 49.)  He used to be very active in online gaming and socialized online, but he was not as active in the previous few months and had recently deleted all of his online friends because he did not get along with them.  (*Id.* at 49-50.)  He continued to play less aggressive, single-player and online games for two to four hours at a time; he had stopped playing online, first-person shooter games that he used to play for an hour to 1.5 hours at a time, and which outraged him and hurt his heart and head.  (*Id.* at 61-63, 66.)  Before his health declined, he went to car shows often, but now went approximately once per month.  (*Id.* at 50, 55.)  He also had a hobby of painting Nerf guns to look like antique guns.  (*Id.* at 60-61.)  The smaller guns took a few hours to paint, and the larger guns took a day or so.  (*Id.* at 61.)  He also messaged his younger brother all day through Facebook Messenger about cars.  (*Id.* at 64.)

Plaintiff had difficulty bathing himself with a shower nozzle because it was hard for him to bend over a lot; his shoulder made it hard to wash his back, and standing for long hurt his feet.

(*Id.* at 50.)  He had difficulty shaving because he could not hold a razor for long and kept dropping it.  (*Id.* at 51.)  He sometimes used a back scratcher to get his shirt on (because he could not get his right arm in long sleeves) and to put on his shoe.  (*Id.*)  He had difficulty putting on his underwear and usually leaned against a wall to put them on.  (*Id.* at 51-52.)  Raising his right arm to reach something in a pantry or closet was difficult for him.  (*Id.* at 65.)  He used a grabber tool to reach objects, and he kept his items and food on lower shelves so that he did not have to reach.  (*Id.*)  His mother or her boyfriend helped him get things that were located up high.  (*Id.*)

He did not think he could perform a seated job because he was not good at anything involving typing or reading long distances, and because of his hands.  (*Id.* at 52.)  Every time he tried to use his hands, he dropped things or had shooting pain his fingers.  (*Id.*)  His lower back always hurt, his legs went numb, and he had sharp, tingling pain when he sat for 15-20 minutes at a time.  (*Id.* at 52-53.)  Standing and pacing before sitting down again alleviated some of the tingling in his legs and feet.  (*Id.* at 52.)  He had started using a cane approximately two weeks before the hearing; he used it anytime he had to walk a long distance.  (*Id.* at 56.)

### b.  **VE's Testimony**

The VE testified that Plaintiff had past relevant work experience as a cook, which was medium work with an SVP of 5; a parts salesperson, which was light work[4] with an SVP of 5; a fabricator, which was medium work with an SVP of 4; and an autobody repairer, which was medium work with an SVP of 2.  (*Id.* at 71.)  A hypothetical person with the same age, education, and work history as Plaintiff, who was limited to light work with no lifting more than 10 pounds frequently and 20 pounds occasionally, could stand and walk for just two hours in an eight-hour workday, could sit for six hours in an eight-hour workday, could occasionally stoop, kneel, crouch,

---

[4] The VE opined that, in his experience, medium work was a more appropriate characterization for a parts salesperson. (*See* doc. 15-1 at 71.)

crawl, balance, and climb ramps or stairs, but could not climb ladders, ropes or scaffolding, was restricted to occasional reaching in all directions with the right, dominant upper extremity, and could perform detailed but not complex job tasks, would not be capable of performing any of Plaintiff's past relevant work.  (*See id.* at 71-72.)  There was other available work that the hypothetical person could perform, including a conveyor line bakery worker (light and SVP-2), with a reduced number of 31,500 jobs nationally, and a fruit distributor (light and SVP-2), with a reduced number of 30,000 jobs nationally.  (*See id.* at 72.)  If the hypothetical person were limited to sedentary work with the same restrictions, he would be able to perform the job of callout operator (sedentary and SVP-2), with 40,000 jobs nationally.  (*See id.*)

The VE further opined that if the hypothetical person was also restricted to simple job tasks, occasional interaction with coworkers and supervisors, frequent but not constant bilateral fingering and handling, or occasional fingering and handling, none of the three available jobs identified by the VE would be affected.  (*See id.* at 73-74.)  If the hypothetical person was restricted to occasional public contact, the callout operator job would be unavailable if the restriction included telephonic contact, but the other two jobs would be unaffected.  (*See id.* at 73.)  The VE opined that there would be no available jobs for a hypothetical person who needed to lie down or recline for longer than a standard break, required an additional break, or had more than two absences a month, was occasionally a distraction to coworkers or supervisors for 15% of the workday or greater consistently, was off task more than 10-12% of the workday, or could not sit, stand, or walk for eight hours.  (*See id.* at 74-75.)

### 4.    *ALJ's Findings*

The ALJ issued a decision denying benefits on August 16, 2019.  (*See id.* at 11-33.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity since his alleged

onset date of April 30, 2017. (*See id.* at 16.) At step two, the ALJ found that Plaintiff had the following severe impairments: chronic low back pain, chronic right shoulder pain secondary to supraspinatus syndrome, arthritis and epicondylitis of the right elbow, chronic right knee and ankle pain, coronary artery disease with ischemic cardiomyopathy and a history of myocardial infarction and stenting, diabetes mellitus type 2 with neuropathy, hypothyroidism, and obesity. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Social Security regulations. (*See id.* at 20-22.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with the following limitations: no lifting and carrying more than 10 pounds frequently and 20 pounds occasionally; standing and walking two hours in an eight-hour workday; sitting for six hours in an eight-hour workday; occasional reaching in all directions with the right dominant upper extremity; and performing detailed, but not complex job tasks. (*See id.* at 22-26.) At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work as a cook, parts salesperson, fabricator, or autobody repair helper. (*See id.* at 26-27.) At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform. (*See id.* at 27-28.) The ALJ found that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from April 30, 2017, through the date of his decision. (*See id.* at 28.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove

disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at

any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the

claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner

at step five to show that there is other gainful employment available in the national economy that

the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied

either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational

testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A

finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff presents two primary issues for review:

1.  The ALJ found that the Plaintiff has severe impairments which limit his ability to perform work-related activities. But the ALJ applied an improper legal standard to evaluate severe impairments. The Plaintiff has been prejudiced thereby, as although his treating mental health professionals and a State Agency review physician found that the Plaintiff has a severe major depressive disorder which interferes with his ability to perform work-related activities, the ALJ substituted his own medical judgment and rejected depression as a severe impairment. Did the ALJ properly consider all of the Plaintiff's vocationally significant impairments in determining his residual functional capacity?

    The Plaintiff submits that the answer is "No."

2.  The ALJ found that the Plaintiff is limited to occasional reaching in all directions with the right upper dominant extremity. But the evidence demonstrates that the Plaintiff is limited in range of motion of both shoulders, the elbows, wrists, and fingers bilaterally. Further, testing revealed that his manual dexterity was below the 1st percentile. Yet, the ALJ failed to include any limitations with regard to use of the non-dominant left upper extremity, nor did the ALJ consider limitations in handling and fingering in determining Plaintiff's residual functional capacity. Did the ALJ properly consider all of the Plaintiff's functionally limiting symptoms in determining his capacity to perform work-related activity?

    The Plaintiff asserts that the answer is "No."

(doc. 18 at 2-3.)

### A.    <u>Severity Standard</u>

Plaintiff first argues that the ALJ applied an improper standard to evaluate the severity of Petitioner's impairments at step two of the sequential evaluation process. (*See* doc. 18 at 2, 6-8.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not

severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only. . . make a *de minimis* showing that [the] impairment is severe enough to interfere with her ability to do work." *Anthony*, 954 F.2d at 294 n.5 (citation omitted). "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[ ], [all] symptom-related limitations and restrictions must be considered at this step." Social Security Ruling (SSR) 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, when identifying Plaintiff's severe impairments, the ALJ did not mention or cite the severe impairment standard set forth in *Stone*. (*See generally* doc. 15-1 at 14-29.) The ALJ did, however, cite SSR 85-28, which provides: "An impairment or combination of impairments is found 'not severe' . . . [at step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered[.]" SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985); (*see* doc. 15-1 at 15.) Recently, in *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021), the Fifth Circuit expressly held that SSR 85-28 is consistent with and comports with the *Stone* standard despite the different

25

wording. *Id.* (comparing similar language used in *Stone* and SSR 85-28 and stating, "Though the precise wording differs, *Stone* and SSR 85-28 are not substantially different enough to warrant a finding of error" where the ALJ did not mention *Stone*, but did cite to SSR 85-28). Accordingly, to the extent Plaintiff claims that the ALJ erred because he recited a severity standard that differed from *Stone*, his claim is without merit, and remand is not required on this basis.

**B.    Severe Impairment**

Plaintiff next argues that the ALJ erred in concluding that Plaintiff's depression was not a vocationally significant impairment and was not severe under the Social Security regulations. (*See* doc. 18 at 2, 8-11.)  The Commissioner responds that the ALJ properly determined Plaintiff's severe impairments at step two, and that even if the limitations related to his depression were not properly considered, such error was harmless because the ALJ proceeded beyond step two. (*See* doc. 19 at 4-6.)

When determining whether a claimant's impairments are severe at step two of the sequential evaluation process, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that his impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

In his decision, the ALJ noted that Plaintiff had been diagnosed with, and treated for, major depressive disorder, recurrent and severe without psychotic features, and had been assigned a GAF score of 45 in April 2018. (*Id.* at 17-18.)  He found that the medical records showed somewhat sporadic mental health therapy from June 2018 through February 2019 that was largely unremarkable for any acute symptoms or higher levels of psychiatric treatment. (*Id.* at 18.)  He

noted that in June 2018, Plaintiff had been assessed with major depressive disorder, recurrent and mild, with a GAF score of 55, after admitting to recent improvements in his emotional stability following lifestyle changes and exhibiting wholly intact speech, thought content, judgment, orientation, memory, and mood. (*Id.*) He generally found that the medical records showed that despite Plaintiff's various reported symptoms relating to depression, he exhibited normal interpersonal behavior and presented normally with respect to hygiene, attitude, psychomotor activity, affect, speech, thought content, insight, sensorium, orientation, consciousness, cognition, and memory. (*Id.* at 17-18.)

The ALJ also considered Dr. Hammond's opinion that Plaintiff had mental impairments resulting in a moderate range of limitations with understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.[5]  The ALJ noted that Dr. Hammond simultaneously indicated that Plaintiff was able to understand, remember, and carry out detailed non-complex instructions, make decisions, maintain attention and concentration, interact with others, and respond to changes. (*Id.* at 19, 116, 132.) Noting that Dr. Hammond had not independently examined Plaintiff or reviewed evidence from the hearing, the ALJ concluded that Dr. Hammond's opinion was substantially unsupported and inconsistent with the medical evidence of record. (*Id.* at 19.) The ALJ noted that nearly all of Plaintiff's mental health evaluations were unremarkable for any cognitive or emotional abnormalities; Plaintiff did not complain about any acute intellectual or cognitive problem and had never been referred to higher levels of psychiatric care; and no acute concerns

---

[5] Specifically, Dr. Hammond opined that Plaintiff had moderate limitations in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (*Id*. at 18-19, 114-16, 130-32.)

had been raised about his mental functioning.  (*Id.*)  He also noted that Plaintiff's hearing testimony indicated he could complete various activities, such as sustaining a normal and daily routine, independently caring for himself, preparing meals, performing some household chores, driving, going out alone, shopping in stores, pursuing hobbies, and getting along with others, including authority figures.  (*Id.*)  The ALJ found Dr. Hammond's opinions unpersuasive in his analysis.

The ALJ concluded that the general lack of mental health evidence failed to show that Plaintiff had more than minimal limitations in his abilities to understand, remember, or apply instructions, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 18-19.)  He therefore determined that Plaintiff did not have any severe mental condition under the Social Security regulations.  (*Id.*)

Plaintiff has not shown that his depression was a severe impairment, and substantial medical evidence instead supports the ALJ's findings that his depression did not result in more than minimal limitations in his ability to perform work-related activities.  *See, e.g.*, *Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities").  Although Plaintiff relies on Dr. Hammond's opinion to support his argument, the Fifth Circuit has held that the "reports of physicians who did not examine the claimant, taken alone, 'would not be substantial evidence on which to base an administrative decision.'"  *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (quoting *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980)).  As discussed, the ALJ found that Dr. Hammond's opinion was substantially inconsistent with the evidence of record and was not based on an independent examination of Plaintiff.  Plaintiff has not shown otherwise.  The

ALJ did not err by finding Plaintiff's depression to be non-severe, and remand is not required on this basis.

## C.    **Mental RFC Assessment**

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (*See* doc. 18 at 10-13.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. at § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to

the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1. *Ripley Error*

Plaintiff argues that the ALJ's RFC determination limited him to performing detailed, but not complex job tasks, but made "no accommodation for interference with the inability to interact with others, nor with regard to the Plaintiff's ability to adapt in a work setting." (doc. 18 at 11.) According to him, an SAMC found that he would be significantly limited in these two areas. (*See id.*) He argues that the ALJ substituted his own medical judgment for that of treating and evaluating physicians, which is prohibited by *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995). (*See id.* at 10.) He claims that the RFC determination is therefore deficient. (*See id.* at 11.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *Ripley*, 67 F.3d at 552. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record

incomplete.  *Id.*  Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision.  *Id.*  The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence.  *Id.*  The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician.  *Id.* at 557-58.  Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts.  *Id.* at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp.2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

Here, earlier in the disability inquiry, the ALJ considered Dr. Hammond's opinion that Plaintiff had mental impairments resulting in a moderate range of limitations with understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself, as well as Dr. Hammond's statement that Plaintiff was able to understand, remember, and carry out detailed non-complex instructions, make decisions, maintain attention and concentration, interact with others, and respond to changes.  (doc. 15-1 at 19, 109, 116, 125.)  The ALJ then rejected Dr. Hammond's opinion, concluding that it was unpersuasive because it was substantially inconsistent with the medical evidence of record and was not based on any independent evaluation of Plaintiff.  (*See id.* at 19.)  In determining Plaintiff's RFC, the ALJ included only one of the limitations from Dr. Hammond's rejected opinion that

Plaintiff was able to perform detailed non-complex tasks.  (*Id.* at 19, 22.)  The ALJ did not explain

how he determined that Plaintiff was able to perform detailed but not complex job tasks.

    While the ALJ may choose to reject the opinion of a SAMC, such as Dr. Hammond, "he

cannot independently decide the effects of Plaintiff's . . . impairments on his ability to work, as

that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL

991252, at *5 (N.D. Tex. Mar. 13, 2013).  Aside from the opinion of Dr. Hammond, which the

ALJ rejected, there is no medical evidence in the record regarding the effects that Plaintiff's

depression or other mental impairments had on his ability to work.  "[E]vidence which merely

describes Plaintiff's medical conditions is insufficient to support the ALJ's RFC determination."

*See Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014)

(citing *Ripley*, 67 F.3d at 557).  Because the ALJ rejected the only medical opinion regarding the

effect of any of Plaintiff's mental impairments on his work-related abilities, the ALJ appears to

have relied on his own interpretation of the medical and other evidence, which he may not do.  *See*

*Fitzpatrick v. Colvin*, No. 3:15-CV-3202-D, 2016 WL 1258477, at *8 (N.D. Tex. Mar. 31, 2016)

(finding that the ALJ "improperly made an independent RFC finding" as to "the effects of [the

claimant's] mental impairments on [her] ability to work" where "other than the opinions of the

two [state agency medical consultants]," there was no evidence in the record as to the claimant's

ability to work despite his impairments); *Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir.

2009) ("[a]n ALJ may not–without the opinions from medical experts–derive the applicant's

[RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may

not rely on his own unsupported opinion as to the limitations presented by the applicant's medical

conditions."). Although he included one of the limitations from Dr. Hammond's rejected opinion,

i.e., that Plaintiff was able to perform detailed non-complex tasks, there is no support in the record

for the ALJ's determination that the other mental limitations identified by Dr. Hammond would not have an effect on Plaintiff's ability to work.

Because the ALJ erred by making an independent RFC determination which was not otherwise supported by medical evidence addressing the effect of any mental impairment on Plaintiff's ability to work, substantial evidence does not support the his RFC determination. *See Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination).

### 2. *Harmless Error*

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, he must show that the ALJ's failure to rely on a medical opinion as to the effects his mental impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting the disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion in determining Plaintiff's mental RFC casts doubt as to whether substantial evidence exists to support the finding that he is not disabled. *See Williams*, 355 F. App'x at 832 (finding that the ALJ's RFC determination was not supported by

substantial evidence because the ALJ rejected medical opinions and relied on his own medical opinions as to the limitations presented by the claimant's impairments); *see also Thornhill*, 2015 WL 232844, at \*11 (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"); *Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medical opinion in determining the claimant's RFC. Accordingly, the error is not harmless, and remand is required on this issue.[6]

## IV.    RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 4th day of March, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] Plaintiff also argues that the ALJ erred in determining his physical RFC because he failed to include handling and fingering limitations, and that the hypothetical question posed to the VE by the ALJ was defective. (*See* doc. 18 at 12-13.) Because remand is recommended based on the ALJ's mental RFC determination, the remaining claims will not be addressed here.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE